UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

HILATURAS MIEL, S.L.,

                    Plaintiff,                06 Civ. 12

        -against-                             OPINION

REPUBLIC OF IRAQ,

                    Defendant.

----------------------------------X

A P P E A R A N C E S:


        Attorneys for Plaintiff

        THOMPSON & KNIGHT LLP
        919 Third Avenue, 39th Floor
        New York, NY   10022
        By:  Brian C. Dunning, Esq.
             Irene Ribeiro Dubowy, Esq.

        Attorneys for Defendant

        MAGGS & McDERMOTT LLC
        910 17TH Street, N.W., Suite 800
        Washington, D.C.   20006
        By:  Timothy B. Mills, Esq.

        Co-Counsel for Defendant

        LAW OFFICES OF STEPHEN ALBRIGHT
        368 Veterans Memorial Highway, 2nd Floor
        Commack, NY   11725
        By:  Stephen Albright, Esq.

**Sweet, D.J.**

This action arises out of a contract (the "Contract")
entered into under the United Nations ("UN") Oil for Food
Program ("OFFP"). The motions raise issues of subject matter
jurisdiction and service under the Foreign Sovereign Immunities
Act, 28 U.S.C. § 1602 et seq., and the effect of the hostilities
in Iraq on the contractual rights of the parties.

The Republic of Iraq (the "Republic of Iraq" or the
"Defendant") has moved under Rules 12(b)(1), (4), (5) and (6)
Fed. R. Civ. P. to dismiss the complaint of the plaintiff
Hilaturas Miel, S.L. ("Hilaturas" or the "Plaintiff") and,
alternatively, for summary judgment under Rule 56, Fed. R. Civ.
P.. Hilaturas has cross-moved under Rule 56, F. R. Civ. P. for
summary judgment. Upon the findings and conclusions set forth
below, the motion of Iraq is granted in part and denied in part,
and the motion of Hilaturas is denied.[1]

---

[1] The Republic of Iraq has also moved to strike the Plaintiff's Rule 56
Statement for failure to comply with the timeliness requirement of the local
rule. In view of the extensive submissions by both parties and the full
opportunity for briefing and factual submissions, the motion is denied.

## I.  **PRIOR PROCEEDINGS**

Hilaturas filed its complaint on January 3, 2006,
alleging that the Republic of Iraq breached the parties'
contract O.C. 702.800, awarded on July 18, 2001 (the
"Contract"), pursuant to which Hilaturas agreed to sell to the
Republic of Iraq 500,000 metric tons of acrylic yarn.  Hilaturas
has alleged damages of € 398,326 as a result of the failure of
the Republic of Iraq to provide means of inspection and
acceptance of yarn shipped under the Contract.

On January 3, 2003, Hilaturas' counsel requested that
the Clerk of the Court serve the Republic of Iraq by mail,
return receipt requested, dispatched by the Clerk of the Court
to the head of state assigned to receive process on such cases,
in accordance with FSIA section 1608(a)(3).  The following day,
counsel was notified by the Clerk's Office that the U.S. Postal
Service was not accepting mail directed to Iraq.

By letter dated February 9, 2006, Hilaturas' counsel
requested that the Clerk of the Court serve the Republic of Iraq
through diplomatic channels pursuant to section 1608(a)(4).  On
May 3, 2006, the American Embassy in Baghdad, Iraq, transmitted
the summons, complaint and notice of suit to the Ministry of

Foreign Affairs of the Republic of Iraq on May 3, 2006. The exhibits to the complaint were omitted as was any translation of the exhibits.

The Republic of Iraq neither appeared nor answered the complaint within the 60-day period allowed under 28 U.S.C. § 1608(d), and on December 5, 2006, Hilaturas moved the Court for a default judgment.

In or around April, 2007, Timothy Mills, attorney for the Republic of Iraq, contacted Brian C. Dunning, Hilaturas' counsel, by email, stating that he had been retained by the Republic of Iraq, which intended to appear and defend Hilaturas' suit. Affidavit of Brian C. Dunning, ¶ 12. Counsel for the Republic of Iraq and Hilaturas agreed to the Defendant's appearance by a joint letter that was so ordered on April 26, 2006.

The instant motions were initiated on September 10, 2007, and heard on March 19, 2008.

## II. **FACTS**

The material facts were set forth in the Defendant's
L. Cv. R. 56.1 Statement of Undisputed Material Facts in Support
of Defendant Republic of Iraq Motion to Dismiss, and, in the
Alternative, for Summary Judgment ("Def. Stmt.") and Hilaturas
Miel's Rule 56.1 Statement ("Pltff. Stmt."). The facts are not
in dispute except as noted below.

### A. **The Parties**

Hilaturas is a privately-held company organized and
existing under the laws of Spain, with an office and principal
place of business at Santa Anna 5, Alcoy (Alicante) Spain.
Hilaturas is engage in the business of manufacturing and selling
commercial-grade yarn worldwide.

The Republic of Iraq is a foreign state within the
meaning of 28 U.S.C. § 1603(a).

### B. **The Oil for Food Programme**

On April 14, 1995, the (UN) Security Council adopted
Security Council Resolution 986 ("S/RES/986") by which the UN

4

established the humanitarian needs program known as the "Oil for Food Programme" (the "OFFP"). Resolution 986 directed the Secretary-General to establish an escrow account, to be funded by the sale of Iraqi petroleum and petroleum products, and to be used to meet the humanitarian needs of the Iraqi population, including the export to Iraq of "medicine, health supplies, foodstuffs, and materials and supplies for essential civilian needs . . . ." S/RES/986 ¶ 8(a). Under the terms of the resolution, each export of goods was required to be at the request of the Government of Iraq, which was required to effectively guarantee equitable distribution, and the Secretary-General was required to receive authenticated confirmation that the exported goods arrived in Iraq. Id. ¶ 8(a)(i-iii).

On May 20, 1996, the Secretariat of the United Nations and the Government of Iraq concluded a Memorandum of Understanding on the Implementation of Security Council Resolution 986 (1995) (the "OFFP MOU"). The OFFP MOU describes how administration of the OFFP was to be overseen by the Security Council Committee established by Resolution 661 (1990) concerning the situation between Iraq and Kuwait (the "661 Committee"). It provides that "[t]he purchase of medicine, health supplies, foodstuffs, and materials and supplies for essential civilian needs of the Iraqi population . . . will

5

follow normal commercial practice and be on the basis of the

relevant resolutions of the Security Council and procedures of

the 661 Committee." Id. ¶ 19.

The OFFP MOU further provides:

24. After the 661 Committee has taken action on
the applications for export in accordance with
its procedures, the Central Bank of Iraq will
request the bank holding the "Iraq Account" to
open irrevocable letters of credit in favour of
the beneficiaries. Such requests shall be
referred by the bank holding the "Iraq Account"
to the United Nations Secretariat for approval of
the opening of the letter of credit by the latter
bank, allowing payment from the "Iraq Account"
upon presentation of credit-conform documents.
The letter of credit will require as a condition
of payment, inter alia, the submission to the
bank holding the "Iraq Account" of the documents
to be determined by the procedures established by
the 661 Committee, including the confirmations by
the agents referred to in paragraph 25, below.
The United Nations, after consultations with the
Government of Iraq, shall determine the clause to
be inserted in all purchase orders, contracts and
letters of credit regarding payment terms from
the "Iraq Account". . . .

25. The arrival of goods in Iraq purchased under
the plan will be confirmed by independent
inspection agents to be appointed by the
Secretary-General. No payments can be made until
the independent inspection agents provide the
Secretary-General with authenticated confirmation
that the exported goods concerned have arrived in
Iraq.

The Secretary-General reported to the Security Council

on November 25, 1996, that the escrow had been established, and

6

that the New York branch of Banque Nationale de Paris had been selected as the holder of the account. See Interim Report of the Security-General on the Implementation of Security Council Resolution 986, U.N. Doc. S/1996/978 at ¶ 32 (Nov. 25, 1996). This United Nations escrow account became known as the "Iraq Account."

The Office of the Iraq Programme (the "OIP") was to be responsible for the overall management and coordination of all United Nations humanitarian activities in Iraq under Resolutions 661 (1990) and 986 (1995), the OFFP MOU, and the procedures established by the Security Council and the 661 Committee. Under the authority of UN Security Council Resolutions and the OFFP MOU, the OIP established that OFFP humanitarian contract payments would be funded exclusively with proceeds from Iraqi oil exports, paid out of the Iraq Account. The OIP administered the OFFP as an operation separate and distinct from all other United Nations activities within the context of the sanctions regime.

The Government of Iraq was required to prepare a categorized list of humanitarian supplies which it intended to purchase and import pursuant to Resolution 986 (1995) and to submit the list to the UN Secretary-General. The Government of

7

Iraq or the United Nations Inter-Agency Humanitarian Programme (for the three northern governorates of Dohuk, Erbil and Sulaymaniyah) would contract directly with suppliers to arrange the purchase of humanitarian supplies, and would conclude the appropriate contractual arrangements, subject to approval of the 661 Committee following application for 661 Committee approval made by the exporter. An exporter's application for 661 Committee approval was made by the exporter providing the application to its country's Permanent Mission to the UN, for forwarding to OIP by the Permanent Mission of the exporting State (Spain, in the case of Hilaturas).

Upon determination that the application did not contain any item prohibited under the UN sanctions program, OIP would inform the Government of Iraq and the submitting mission or United Nations agency in written form. The exporter would be eligible for payment from the escrow account established pursuant to paragraph 7 of Resolution 986 upon verification by United Nations agents that the items in the application had arrived in Iraq as contracted.

Following approval of items for export to Iraq in accordance with procedures adopted under Resolution 1409 (2002), the OIP issued an Approval Letter. When the parties concerned

had been informed that the exporter was eligible for payment from the Iraq Account, the Central Bank of Iraq would request the bank holding the Iraq Account to open an irrevocable, non-transferable, non-assignable (except to the supplier's bank for the repayment of financing for the purchase of the humanitarian supplies) letter of credit for the account of the Iraqi purchaser in favor of the supplier, which would be available only at the bank holding the Iraq Account, and provide for payment from the Iraq Account. Such requests were to be submitted by the bank holding the Iraq Account to the Secretary-General for expeditious approval, so that payment from the Iraq Account could be made without delay. The letter of credit was to require as a condition of payment the submission to the bank holding the Iraq Account of the usual commercial documentation, a copy of the Committee's letter stating that the exporter is eligible for payment from the Iraq Account, and a standardized confirmation by the Secretary-General of the arrival of the humanitarian supplies in Iraq.

The arrival of the humanitarian supplies in Iraq was to be confirmed by independent inspection agents appointed by the Secretary-General pursuant to Resolution 986 and stationed at relevant entry points and other locations in Iraq as referred to in paragraph 26 of the OFFP MOU. The independent inspection

9

agents were to add their authenticated confirmation of arrival
to a copy of the Committee's letter stating that the exporter is
eligible for payment from the Iraq Account and to a copy of the
invoice, and inform the Secretary-General in accordance with
paragraph 8(a)(iii) of Security Council Resolution 986.
According to paragraph 10 of the procedures adopted by
Resolution 1409 (2002), OIP and the United Nations Treasury
"will inform the banks within five working days that the items
in the application have arrived in Iraq".

The bank holding the Iraq Account was to effect
payment under any letter of credit only if all documents
stipulated in the letter of credit were presented to it and the
terms and conditions of any such letter of credit were complied
with.

On December 5, 2000, the UN Security Council adopted
Security Council Resolution 1330 (2000) ("S/RES/1330"), which
extended the OFFP and broadened commodities purchases
thereunder.

## C.    The Contract

In 2000, Hilaturas participated in an OFFP "yarn procurement opportunity" and bid for an OFFP contract to provide acrylic yarn to State Company for Shopping Centers, a state-owned enterprise under the Ministry of Trade of the Republic of Iraq.    Hilaturas ranked second in the bidding for the Contract, behind the awardee, Hilados Belmonte, S.A. ("Hilados Belmonte"). On July 18, 2001, Hilados Belmonte and the State Company for Shopping Centers concluded the Contract in Baghdad, Iraq.    The Contract did not go into effect until after Hilados Belmonte submitted the Contract to the 661 Committee, through the Permanent Mission of Spain to the UN, and received the 661 Committee's approval.

The Contract was undertaken "ACCORDING TO THE MEMORANDUM OF UNDERSTANDING BETWEEN THE SECRETARIAT OF THE UNITED NATIONS AND THE IRAQI GOVERNMENT ON THE IMPLEMENTATION OF SECURITY COUNCIL RESOLUTION (1330)."    Affidavit of Antonio Santacreu ("Santacreu Aff."), Ex. B.

Paragraph 9 of the Contract provides that payment shall be:

11

IN CASH L/C GOVERNED BY L.C.P. 1993 REVISION OF
I.C.C. PUBLICATION NO.500 OPENED BY BANQUE
NATIONAL DE PARIS S.A. NEW YORK BRANCH (IRAQ
ACCOUNT) ACCORDING TO THE REQUEST OF CENTRAL BANK
OF IRAQ FOR THE BENEFIT OF THE SELLER PAYABLE
FROM THE CASH COLLATERAL REQURED UNDER L/C AMOUNT
AND ITS FEES PURSUANT TO THE (M.O.U.) AGREEMENT.
ACCORDING TO SUBMISSION OF THE FOLLOWING
DOCUMENTATION:

\*    \*    \*

9-3- A CONFIRMATION BY THE SECRETARY GENERALS'
DESIGNEE THAT EXPORTED GOODS ARRIVED TO IRAQ AND
COMPLIED WITH L/C CONDITIONS.


Paragraph 10 requires:

B. THE BANK SHALL NOT MAKE ANY PAYMENT UNDER
THIS L/C UNLESS THE AUTHORIZED UNITED NATIONS
[OF]FICIALS DESIGNATED AND HAVING APPROPRIATE
AUTHORITY APPROVE SUCH PAYMENT.

C. ALL REQUIRED DOCUMENTS LISTED ABOVE AND
STIPULATED IN THE L/C ARE PRESENTED AND IN ORDER
IN ADDITION TO THAT TERMS AND CONDITIONS OF L.C
ARE COMPLIED WITH.


Paragraph 10 also provides that partial payments

can be made corresponding to actual deliveries to Iraq, and

that installments documentary discrepancies can be waived

only by the Secretary General.

On or about July 18, 2001, the 661 Committee approved

the Contract between Hilados Belmonte and the State Company for

Shopping Centers. The approved "Method of Payment" was stated

12

in Block 15: "From the Iraq Account in accordance with SC resolution 1330 (Relevant documentation including contract(s) must be attached)." Santacreu Aff, Ex. B.

On February 20, 2002, Banque de Paris New York Branch (BNP-NY) issued Letter of Credit No. U733431 (the "Letter of Credit") in favor of Hilados Belmonte with respect to the Contract. The Letter of Credit required the seller to deliver to BNP-NY confirmation of the arrival of the exported goods in Iraq as a condition precedent to payment.

On April 18, 2002, Hilados Belmonte ceded the Contract and the BNP-NY Letter of Credit to Hilaturas, subject to approval by the State Company for Shopping Centers and the UN OIP.

On or about May 25, 2002, the State Company for Shopping Centers and Hilaturas executed Addendum No. 1 to the Contract in Baghdad, Iraq, substituting Hilaturas for Hilados Belmonte.

On or about July 2002, the 661 Committee approved the amendment of the Contract.

### D. **Performance Under the Contract and the Commencement of Hostilities**

Prior to the commencement of armed hostilities on
March 19, 2003 between the United States-led Coalition Forces
and the then-Government of Iraq, Hilaturas made partial
shipments under the Contract that arrived in Iraq and were
accepted. Hilaturas received payments for these shipments
pursuant to the Contract and the Letter of Credit.

On March 17, 2003, the United Nations Secretary-
General announced that in view of warnings received from the
Governments of the United Kingdom and the United States
regarding the prospect of war and the continued safety and
security of UN personnel present in the territory of Iraq, he
was no longer in a position to guarantee their safety and
security. All remaining UN international staff in Iraq were
evacuated on March 18, 2003, including the UN Secretary
General's designated OFFP inspectors, Cotecna Inspection S.A.
("Cotecna").

The President of the Security Council asked the
Secretary General to submit proposals to adjust the mandate of
the Oil for Food Programme so that it would have flexibility to

meet new humanitarian challenges presented by the prospect of war in Iraq. On March 19, 2003, the war in Iraq began with the bombing of Baghdad.

In the months of February and March 2003, Hilaturas delivered and loaded onto vessels in the Port of Valencia five 40-foot containers containing 66.36 metric tons of acrylic yarn, with a contract value of approximately € 266,450, destined for Iraq via Aqaba, Jordan (the "Aqaba Goods"). On or about March 26, 2003, the last of the Aqaba Goods reached the port of Aqaba, Jordan, seven days after the commencement of hostilities between Coalition Forces and the Government of Iraq, and nine days after the Cotecna removed all OFFP inspectors from UN inspection points within Iraq.

Due to Cotecna's withdrawal, the Aqaba Goods were put into storage in the Port of Aqaba and made available for inspection and disposition.

In or about February 2003, Hilaturas transported to Valencia one 40-foot container containing 13.31 metric tons of acrylic yarn, with a contract value of approximately € 53,472. In or about March 2003, Hilaturas retained in Spain shipping

containers containing, respectively, 13.31 tons and 44.10 tons of yarn, comprising the final shipment under the Contract.

Also due to the withdrawal of the Cotecna, part of the Valencia Goods remained in the port of Valencia while Hilaturas awaited instructions and assurances of payment from the United Nations or the government of Iraq. In order to preserve this portion of the Valencia Goods, Hilaturas has incurred various costs.

At no time during the OFFP (whether administered under the UN or under the CPA) did the Government of Iraq either conduct or control inspections required as a condition precedent to payment pursuant to the terms of the Contract or control the decisions that were made with respect to potential disposition of the yarn.

## E. Revision of the OFFP

On March 28, 2003, the UN Security Council adopted Security Council Resolution 1472 (2003) ("S/RES/1472"). Paragraph 4 of Resolution 1472 authorized the Secretary-General:

(a) to establish alternative locations, both inside and outside Iraq, in consultation with the respective governments, for the delivery,

16

inspection and authenticated confirmation of humanitarian supplies and equipment provided under the Programme, as well as to re-direct shipments of goods to those locations, as necessary;

(b) to review, as a matter of urgency, the approved funded and non-funded contracts concluded by the Government of Iraq to determine the relative priorities of the need for adequate medicine, health supplies, foodstuffs and other materials and supplies for essential civilian needs represented in these contracts which can be shipped within the period of this mandate, to proceed with these contracts in accordance with such priorities;

(c) to contact suppliers of these contracts to determine the precise location of contracted goods and, when necessary, to require suppliers to delay, accelerate or divert shipments;

(d) to negotiate and agree on necessary adjustments in the terms or conditions of these contracts and their respective letters of credit and to implement the measures referred to in paragraph 4 (a), (b) and (c), notwithstanding distribution plans approved under the Programme;

(e) to negotiate and execute new contracts for essential medical items under the Programme and to authorize issuance of the relevant letters of credit, notwithstanding approved distribution plans, provided that such items cannot be delivered in execution of contracts pursuant to paragraph 4 (b) and subject to the approval of the Committee established pursuant to resolution 661 (1990);

(f) to transfer unencumbered funds between the accounts created pursuant to paragraphs 8(a) and 8(b) of resolution 986 (1995) on an exceptional and reimbursable basis as necessary to ensure the delivery of essential humanitarian supplies to the people of Iraq and to use the funds in the escrow accounts referred to in paragraphs 8(a) and (b) of resolution 986 (1995) to implement the

17

Programme as provided for in this resolution, irrespective of the phase in which such funds entered the escrow accounts or the phase to which those funds may have been allocated;

(g) to use, subject to procedures to be decided by the Committee established by resolution 661 (1990) prior to the end of the period set out in paragraph 10 below and based on recommendations provided by the Office of the Iraq Programme, funds deposited in the accounts created pursuant to paragraphs 8(a) and (b) of resolution 986 (1995), as necessary and appropriate, to compensate suppliers and shippers for agreed additional shipping, transportation and storage costs incurred as a result of diverting and delaying shipments as directed by him according to the provisions of paragraph 4(a), (b) and (c) in order to perform his functions set out in paragraph 4(d);

S/RES/1472 ¶ 4.

On April 9, 2003, Coalition Forces entered Baghdad. The Government of Iraq ceased to function and collapsed; the Ministries and state-owned enterprises were looted.

On April 15, 2003, UN OIP notified Hilaturas by letter that the OFFP Contract had "NOT been identified as a priority contract pursuant to paragraph 4(b) of Security Council Resolution 1472 (2003)." Santacreu Aff., Ex. G. The letter went on to inform Hilaturas that Security Council Resolution 661 authorized the UN to contact suppliers not yet identified as priorities in order to discuss possible compensation pursuant to

18

paragraph 4(g) of Resolution 1472. The letter also stated that

only suppliers whose goods were in transit to Iraq as of March

17, 2003, the date the Cotecna inspectors were withdrawn, would

be eligible to be considered for compensation. Suppliers who

chose to dispose of goods in transit to Iraq to alternative

markets would not be eligible for compensation pursuant to

paragraph 4(g). The letter continued:

> Alternatively, you may elect to arrange for the
> storage of the goods until the conclusion of the
> 45-day period mandated by resolution 1472 (2003),
> i.e., 12 May 2003, at which time you may be
> reimbursed for agreed storage costs incurred. If
> this option is selected, the Office of the Iraq
> Programme would be required to renegotiate the
> existing contractual arrangements with your
> company, to include any necessary revisions to
> the cost of insurance and shipping/transportation
> to intermediate storage facilities established by
> your company and transportation from the
> intermediate location to an alternative delivery
> location. Your company may also be required to
> arrange for independent quality control testing
> for certain commodities, a cost which would be
> included in the revised contractual value. In
> considering this option, I must, however, advise
> you that, with the exception of storage costs,
> the United Nations is not in a position to
> authorize payment unless the arrival of the goods
> at the final agreed delivery point has been
> confirmed by the UN independent inspection agent
> pursuant to paragraph 8(a)(iii) of Security
> Council resolution 986 (1995) and that, given the
> current situation in Iraq, it is not currently
> possible to estimate when delivery will be
> possible.

Id.

On April 30, 2003, the Letter of Credit expired.

On May 8, 2003, the United States and the United
Kingdom notified the President of the Security Council of their
collective intent to create the Coalition Provisional Authority
("CPA") under which the two states would exercise specific
authorities, responsibilities and obligations as the occupying
powers in Iraq.

On May 23, 2003, the UN Security Council adopted
Security Council Resolution 1483 (2003). Paragraph 16 of
Resolution 1483 directed that the Secretary-General terminate
the ongoing operations of the OFFP within six months,
transferring responsibility for administration of any remaining
activity under the OFFP to the CPA. In those six months, the
Secretary-General was directed to facilitate the delivery of
priority civilian goods in coordination with the CPA and the
Iraqi interim administration, including, as necessary,
negotiating adjustments in the terms or conditions of contracts
and respective letters of credit. The Secretary-General was
also directed to review in light of changed circumstances, and
in coordination with the CPA and the Iraqi interim
administration, the relative utility of each approved and funded
contract with a view toward determining whether such contracts

20

contained items required to meet the needs of the people of
Iraq, and to postpone action on those contracts determined to be
of questionable utility and the respective letters of credit
until a recognized, representative government of Iraq was in a
position to make its own determination as to whether the
contracts should be fulfilled. Finally, the Secretary-General
was instructed to negotiate settlement payments with those
parties that previously had entered contractual obligations
under the OFFP.

On June 26, 2003, the OIP wrote Hilaturas that the CPA
had indicated a willingness to receive the yarn in transit to
Iraq as of March 17, 2003. The OIP noted that the Authority's
agreement to accept the goods was provisional, and informed
Hilaturas that:

> As soon as these priorities are set, you will be
> contacted by the United Nations to arrange a
> contractual amendment providing for the delivery
> of the goods as well as any compensation for
> additional insurance, transportation or storage
> costs. It must be stated that the delivery will
> only concern the consignment of goods in transit,
> not the whole contract, and that compensation
> will be based upon fair market prices.

Santacreu Aff, Ex. H.

On June 30, 2003, Hilaturas responded to OIP's June
26, 2003 letter, requesting compensation of additional

demurrages, port occupation and insurance charges. In that correspondence, Hilaturas stated:

> We are conscious that our Contract was not adopted as "priority" and therefore all goods - except those "in transit" - were disregarded from any further processing. Anyhow, we'd very much appreciate your advise [sic] about any possible solution which may let us ship those 40 Mt of acrylic yarns.

Id., Ex. I.

On September 4, 2003, Hilaturas wrote to the UN OIP:

> With less than 12 weeks to the closure of the Iraqui [sic] Programme, we grow more anxious with every passing day and with every updated and published list which does not include our Contract. Moreover, by reviewing all the lists ("Contracts confirmed in transit", "Approved and funded Contracts" and "Prioritized Contracts") we might infer from them that most of the contracts established with Spanish suppliers have been already classified as prioritized but, unfortunately, not ours.

Id., Ex. K.

In its "phasedown" prior to closure on November 21, 2003, the OIP continued to identify and ship approved and funded priority items in a pipeline of humanitarian goods and supplies valued at some $8.2 billion. The Contract was not prioritized.

The OIP turned over responsibility for 3,059 OFFP

contracts, with pending shipments valued at $6.2 billion, to the

CPA on November 22, 2003.

On November 25, 2003, the UN Office for Project

Services, at the request of the OIP, offered compensation of

$21,359.20 to Hilaturas in settlement of all its claims. The

correspondence advised Hilaturas that the "Oil for Food

Programme expired 21st November 2003." Id., Ex. L.

On November 26, 2003, Hilaturas rejected the UN Office

for Project Services' offer of settlement, stating:

> Our Contract with the Ministry of Trade was
> concluded under the control, supervision and
> "supposed" guarantees of United Nations. It was
> duly funded under the coverage of the OIP and it
> was expected that such International Organization
> - making use of its responsibility – would have
> responded in a more coherent way to those non-
> prioritized Contracts and suppliers.
>
> Our goods - due to their technical features -
> were produced on purpose and exclusively for the
> Ministry of Trade and are unsaleable in other
> markets.  Though we are aware that those goods
> are still of utility to their original consignee
> and recipient and we reported this fact to the
> OIP, no concerned party - OIP or CPA - has taken
> it into consideration.

Id., Ex. M.

23

On September 30, 2004, Hilaturas asserted its rights under article 73 of the Convention on Contracts for the International Sale of Goods ("CISG"), arranging for the sale of the Valencia Goods at an asserted loss of € 131,876.93.

The Jordanian authorities have taken the position that the containers in Aqaba belong to the Republic of Iraq and have not allowed Hilaturas to attempt to re-sell them.

On June 8, 2004, the UN Security Council adopted Security Council Resolution 1546 (2004). Resolution 1546 provides that in connection with the dissolution of the CPA, the interim Government of Iraq and its successors assume all rights, responsibilities and obligations relating to the OFFP that were transferred to the CPA, including responsibility for ensuring independently authenticated confirmation that goods have been delivered an, following a 120-day transition period from the date of adoption of the resolution, certification of delivery of goods under previously prioritized contracts. The resolution directs that such certification shall be deemed to constitute the independent authentication required for the release of funds associated with those contracts.

## III. **DISCUSSION**

The Republic of Iraq has moved to dismiss the
complaint on the basis of lack of subject matter jurisdiction
under Fed. R. Civ. P. 12(b)(1), insufficient process under Fed.
R. Civ. P. 12(b)(4), insufficient service of process under Fed.
R. Civ. P. 12(b)(5), and failure to state a claim under Fed. R.
Civ. P. 12(b)(6). In the alternative, the Republic of Iraq
moves for summary judgment under Fed. R. Civ. P. 56.

### A. **Subject Matter Jurisdiction Has Been Established**

On a motion to dismiss for lack of subject matter
jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "the district
court can refer to evidence outside the pleadings and the
plaintiff asserting subject matter jurisdiction has the burden
of proving by a preponderance of the evidence that it exists."
Hamm v. United States, 483 F.3d 135, 137 (2d Cir. 2007) (quoting
Luckett v. Bure, 290 F.3d 493, 496-97 (2d Cir. 2002)).

Under the Federal Sovereign Immunities Act ("FSIA"),
the federal district courts have

> original jurisdiction without regard to amount in
> controversy of any nonjury civil action against a
> foreign state . . . as to any claim for relief in

> personam with respect to which the foreign state
> is not entitled to immunity either under sections
> 1605-1607 of this title or under any applicable
> international agreement.

28 U.S.C.A. § 1330. "[T]he FSIA provides the sole basis for

obtaining jurisdiction over a foreign state in federal court."

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428,

439 (1989). See also Virtual Countries, Inc. v. Republic of

South Africa, 300 F.3d 230, 236 (2d Cir. 2002). Under the FSIA,

a foreign state is immune from the jurisdiction of the courts of

the United States except as provided in 28 U.S.C. §§ 1605 to

1607. 28 U.S.C.A. § 1604; Virtual Countries, 300 F.3d at 236.

"Once the defendant presents a prima facie case that it is a

foreign sovereign, the plaintiff has the burden of going forward

with evidence showing that, under exceptions to the FSIA,

immunity should not be granted, although the ultimate burden of

persuasion remains with the alleged foreign sovereign." Cabiri

v. Gov't of the Republic of Ghana, 165 F.3d 193, 196 (2d Cir.

1999); Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012,

1016 (2d Cir. 1993).

It is not disputed that the Republic of Iraq is a

foreign sovereign, and therefore entitled to protection under

the FSIA. Hilaturas asserts, however, that the third clause of

the FSIA commercial exception to sovereign immunity is

applicable. That exception provides:

> A foreign state shall not be immune from the
> jurisdiction of courts of the United States or of
> the States in any case

>     \*    \*    \*

> (2) in which the action is based upon a
> commercial activity carried on in the United
> States by the foreign state; or upon an act
> performed in the United States in connection with
> a commercial activity of the foreign state
> elsewhere; or upon an act outside the territory
> of the United States in connection with a
> commercial activity of the foreign state
> elsewhere and that act causes a direct effect in
> the United States . . . .

28 U.S.C. 1605(a). For the third clause of the commercial

activity exception to apply, "the lawsuit for which jurisdiction

is sought must be (1) 'based . . . upon an act outside the

territory of the United States'; (2) 'that was taken in

connection with a commercial activity of [the foreign state]

outside this country'; and (3) 'that caused a direct effect in

the United States.'" Virtual Countries, 300 F.3d at 236

(emphasis and alteration in original) (quoting Republic of

Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992)).

The Republic of Iraq contends that the last two

conditions are not satisfied here. According to the Republic of

Iraq, the activity upon which the complaint is based (1) was not

commercial activity carried out by the Government of Iraq, but
rather humanitarian relief activity conducted by the UN; and (2)
to the extent it did amount to commercial activity, took place
in Iraq and had no direct effect in the United States.

## 1. The Complaint Is Based Upon the Republic of Iraq's Commercial Activity

The commercial character of a course of activity or
particular transaction is determined by reference to the nature
of the activity, not its purpose. 28 U.S.C. § 1603(d). An
activity is commercial if it is the "type of action[] by which a
private party engage[s] in trade and traffic or commerce."
Weltover, 504 U.S. at 614 (quotation omitted).

The fact that the sale of yarn under the Contract
proceeded under the OFFP regime established by the U.N. does not
change the fact that the activity giving rise to the complaint
was a commercial transaction with a private party. See H.R.
Rep. No. 94-1487, 16, 1976 U.S.C.C.A.N. 6604,6615 (1976) ("[A]
transaction to obtain goods or services from private parties
would not lose its otherwise commercial character because it was
entered into in connection with an AID [Agency for International
Development] program."). Indeed, the OFFP MOU signed on May 20,
1996, by the Secretariat of the United Nations and the

28

Government of Iraq explicitly provided that purchases under the OFFP would follow normal commercial practice. Paragraph 19 of the OFFP MOU provides as follows:

The purchase of medicines, health supplies, foodstuffs, and materials and supplies for essential civilian needs of the Iraqi population throughout the country, as referred to in Paragraph 20 of resolution 687 (1991), will, subject to paragraph 20 below, be carried out by the Government of Iraq, will follow normal commercial practice and be on the basis of the relevant resolutions of the Security Council and procedures of the 661 Committee.

Santacreu Aff., Ex. A at ¶ 19.

The Republic of Iraq has relied upon Saudi Arabia v. Nelson, 507 U.S. 349, 357 (1993) for the proposition that in order for the complaint to be "based upon" given commercial activity, that activity must comprise "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case," and asserts that this definition leads to the conclusion that there is no "commercial activity" alleged here that would entitle Hilaturas to relief. Def. Mem. 33, 44.

In Nelson, the Supreme Court held that jurisdiction could not be predicated on Saudi Arabia's U.S-based efforts to recruit staff for a Saudi hospital because the causes of action alleged by the plaintiffs were not based on those recruitment

activities. The Court went on to distinguish the sovereign

activities upon which the complaint was based in Nelson (abuse

of police power) from the activities in Weltover (refinancing of

bonds in the debt market), concluding that the nature of the

activities undertaken by Saudi Arabia were inherently sovereign

activities, while the nature of the activities in Weltover were

regularly conducted by private parties. The Court reiterated

that the essential question is whether a state is exercising

"only those powers that can also be exercised by private

citizens, as distinct from those powers peculiar to sovereigns."

Nelson, 507 U.S. at 360 (quotations omitted). Here, the

Republic of Iraq, as party to a contract for the purchase of

goods, was acting "in the manner of a private player within the

market," id. (quotation omitted), and Hilaturas's claims are for

breach of that contract. Hilaturas's claims are thus based on

commercial activity undertaken by the Republic of Iraq.


## 2. The Alleged Breach Had a Direct Effect on the United States


"[A]n effect is 'direct' if it follows 'as an

immediate consequence of the defendant's . . . activity."

Weltover, 504 U.S. at 618 (quoting Weltover, Inc. v. Republic of

Argentina, 941 F.2d 145, 152 (2d Cir. 1991)). The Republic of

Iraq argues that there was "no effect — direct or otherwise — in the United States with respect to Hilaturas." Def. Mem. 46 (emphasis in original).

As a preliminary matter, the "direct effect" need not be "with respect to Hilaturas." The Court of Appeals rejected this premise in Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 241 (2d Cir. 1994). In Rafidain Bank, the Commercial Bank of Kuwait sued a commercial bank owned by Iraq and the Iraqi central banking authority for breach of certain commercial guarantees and on a letter of credit under which plaintiff had paid out more than $7.4 million. See id. at 239-240. Although the agreements at issue required the Iraqi banks to make payments into accounts in New York, such payments were not to be made directly to the plaintiff, but to New York bank accounts held by the lead banks of different lending syndicates, which would then distribute the amounts to the other banks in the syndicate, including plaintiff. See id. at 241. The Court of Appeals held that the failure to remit funds in New York as contractually required constituted a direct effect in the United States under Weltover, and that the requisite "material connection" between plaintiff's cause of action and the "commercial activity" was met despite plaintiff's reliance on an agent to collect the sums due. See id. Thus, jurisdiction over

31

the Iraqi instrumentalities was proper due to a direct effect taking place in the United States, even though United States was not the place of performance of contractual obligations owed to plaintiff.

Here, the Contract upon which Hilaturas is suing dictates that the Republic of Iraq's payment to Hilaturas shall be made pursuant to a letter of credit issued by the BNP New York Branch. See Contract §§ 9, 10. Because the Contract requires Hilaturas to present its credit-conform documents and collect the amounts due to it in the United States, the commercial activity had a direct effect in the United States. Cf. Harris Corp. v. Nat'l Iranian Radio and Television, 691 F.2d 1344, 1351 (11th Cir. 1982) (holding fact that letter of credit arrangement extends into United States was sufficient to establish "direct effect" in the United States); Reed Int'l Trading Corp. v. Donau Bank AG, 866 F. Supp. 750, 754-55 (S.D.N.Y. 1994) (same). As in Rafidian Bank, there is still a "material connection" between plaintiff's cause of action and the commercial activity regardless of whether payment was to be made through an intermediary. See also Weltover, 504 U.S. at 619 (finding direct effect in United States where money was contractually required to be delivered to accounts in New York banks); Hanil Bank v. PT. Bank Negara Indonesia, 148 F.3d 127,

132 (2d Cir. 1998) (finding direct effect in United States where contractual breach resulted in failure of funds destined for New York to arrive there); Parex Bank v. Russian Savings Bank, 116 F. Supp. 2d 415, 421 (S.D.N.Y. 2000) (failure to deposit funds into New York bank account had direct effect in the United States). This Court therefore has subject matter jurisdiction.

## B.   **Service of Process and Process Were Insufficient**

The Republic of Iraq has urged that Hilaturas failed to (1) comply with the sequential service requirements of the FSIA; and (2) provide copies and translations of the exhibits to the complaint, and service must therefore be set aside as ineffective.

On a 12(b)(5) motion arguing insufficient service of process, "plaintiff bears the burden of proving adequate service of process," and "a Court must look to matters outside the complaint to determine whether it has jurisdiction." Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002). Objections to sufficiency of process itself under Rule 12(b)(4) must identify substantive deficiencies in the summons, complaint or accompanying documentation. See, e.g., Fagan v. Deutsche Bundesbank, 438 F. Supp. 2d 376, 386

(S.D.N.Y. 2006) (dismissing action for failure to satisfy process requirements for service on foreign state specified in 28 U.S.C.A. § 1608). Cf. U.S. Fire Ins. Co. v. Jesco Const. Corp., 03 Civ. 2906 (SAS), 2003 WL 21689654, at *4 (S.D.N.Y. July 16, 2003) (denying claim of insufficient process where summons and complaint were in proper form and satisfied requirements of Rule 4). "[W]hen the sufficiency of service of process is challenged, '[t]he party on whose behalf service is made has the burden of establishing its validity.'" Seramur v. Saudi Arabian Airlines, 934 F. Supp. 48, 50 (E.D.N.Y.1996) (second alteration in original) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1353, at 283 (1990)). Where process or service of process is insufficient, "[t]he courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant . . . ." Montalbano v. Easco Hand Tools, Inc., 766 F.2d 737, 740 (2d Cir. 1985) (alteration in original) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1354, at 585 (1969)).

Fed. R. Civ. P. 4(j)(1) states that "[s]ervice of process upon a foreign state or a political subdivision, agency, or instrumentality thereof shall be effected pursuant to 28 U.S.C. § 1608 [the FSIA]." Section 1608(a) provides that

service may be made upon a foreign state (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state; (2) if no special arrangement exists, in accordance with an applicable international convention on service of documents; (3) if service cannot be made by methods (1) or (2), "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned"; or (4) if service cannot be made within 30 days by method (3), by serving two copies of the summons and complaint and a notice of suit, together with a translation, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, D.C., to be transmitted to the foreign state through diplomatic channels.

Hilaturas attempted service of the Republic of Iraq through diplomatic channels. The Republic of Iraq argues that service by Federal Express, "a form of mail requiring a signed receipt," was available and has been used by parties in other

actions to serve the Republic of Iraq pursuant to 28 U.S.C. §
1608(a)(3).

By the express language of 28 U.S.C. § 1608(a)(4),
service through diplomatic channels under 28 U.S.C. § 1608(a)(4)
is only appropriate and effective "if service cannot be made
within 30 days" under 28 U.S.C. § 1608(a)(3). A plaintiff is
not permitted to attempt service under section 1608(a)(4) until
it has properly attempted service under section 1608(a)(3).
Courts have allowed substantial compliance in the context of
section 1608(b), the parallel provision governing service on an
agency or instrumentality of a foreign state. However, section
1608(a), which governs service of process on foreign states
themselves, requires strict compliance. Lewis & Kennedy, Inc.
v. Permanent Mission of Republic of Botswana to United Nations,
05 Civ. 2591 (HB), 2005 WL 1621342, at *3 and n.3 (S.D.N.Y. July
12, 2005) (collecting cases); Finamar Investors, Inc. v.
Republic of Tadjikistan, 889 F. Supp. 114, 117 (S.D.N.Y. 1995);
see also Magness v Russian Fed'n, 247 F.3d 609, 615 (5th Cir.
2001), cert. denied, 534 U.S. 892 (2001).

Hilaturas asserts that it attempted service under
section 1603(a)(3), but was informed by the Clerk of Court that
the U.S. Postal Service was not accepting mail directed to Iraq.

Supplemental Affidavit of Irene R. Dubowy ¶¶ 5-6. Accepting this as true, the Republic of Iraq has presented the Declaration of Timothy Mills, which asserts that "[a]s of 2006, both Federal Express and DHL already had established delivery service in Baghdad, Iraq," offering a form of mail that requires a signed receipt. Declaration of Timothy B. Mills in Support of Defendant Republic of Iraq Motion to Dismiss ("Mills Decl.") ¶ 3. To substantial this claim, Mills testifies that he is lead counsel for the Republic of Iraq both in this action and Acree v. Republic of Iraq, 06 Civ. 723 (RWR) (D.D.C.), in which plaintiffs successfully served the Republic of Iraq by Federal Express on April 24, 2006. Mills Decl. ¶¶ 1, 4. Hilaturas does not dispute these facts, but argues that the fact that Federal Express had established delivery service to Baghdad as of April, 2006, does not mean that such service existed in January of the same year. Hilaturas has not provided any factual basis for its suggestion that such service was established between January and April, 2006, and the Court is aware of no reason that this would be the case. Absent any such demonstration, Hilaturas has failed to meet its burden of establishing personal jurisdiction.

In addition, Fed. R. of Civ. P. 12(c) provides in relevant part that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."

In its attempted service under section 1608(a)(4), Hilaturas
failed to send to the Republic of Iraq (a) any of the exhibits
to the complaint (which are in English); and (b) a translation
into Arabic of each exhibit to the complaint. Thus, even had
service of process been sufficient under section 1608, the
process itself was defective.

Instead of dismissing a complaint for invalid service
of process, a Court may give a plaintiff reasonable opportunity
to attempt to effect valid service of process on a foreign
sovereign in a manner complying with the FSIA. See Montalbano,
766 F.2d at 740. While Hilaturas would therefore generally be
granted the opportunity to properly serve the Republic of Iraq,
leave is not granted because of the conclusions reached on the
Republic of Iraq's summary judgment motion as set forth below.

## C. **The Republic of Iraq Did Not Breach the Contract**

For the purposes of a Rule 12(b)(6) motion to dismiss
for failure to state a claim, all factual allegations are
accepted as true, and all inferences are drawn in favor of the
pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d
Cir. 1993). The issue "is not whether a plaintiff will
ultimately prevail but whether the claimant is entitled to offer

evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36 (1974)). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1969 (2007)).

"If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "The determination to convert a motion to dismiss . . . into a motion for summary judgment . . . is within the court's discretion, 'and in exercising its discretion the court looks to the substance of the motion.'" Headley v. Fisher, 06 Civ. 6331 (PAC)(KNF), 2008 WL 1990771, at *9 (S.D.N.Y. 2008) (quoting Ansonia Tenants' Coal., Inc. v. Ansonia Assocs., 163 F.R.D. 468, 470 (S.D.N.Y. 1995)).

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS

Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004).
The courts do not try issues of fact on a motion for summary
judgment, but, rather, determine "whether the evidence presents
a sufficient disagreement to require submission to a jury or
whether it is so one-sided that one party must prevail as a
matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
251-52 (1986).

"The party seeking summary judgment bears the burden
of establishing that no genuine issue of material fact exists
and that the undisputed facts establish [its] right to judgment
as a matter of law." Rodriguez v. City of New York, 72 F.3d
1051, 1060-61 (2d Cir. 1995). In determining whether a genuine
issue of material fact exists, a court must resolve all
ambiguities and draw all reasonable inferences against the
moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith
Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton,
281 F.3d 12, 18 (2d Cir. 2002). However, "the non-moving party
may not rely simply on conclusory allegations or speculation to
avoid summary judgment, but instead must offer evidence to show
that its version of the events is not wholly fanciful." Morris
v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation omitted).

Hilaturas asserts, and the Republic of Iraq does not

dispute, that the Contract is governed by the United Nations

Convention on Contracts for the International Sale of Goods,

opened for signature April 11, 1980, 1489 U.N.T.S. 3, 19 I.L.M.

668 ("CISG").

The CISG, Article 79 states:

(1) A party is not liable for a failure to perform any of his obligations if he proves that the failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it or its consequences.

\*    \*    \*

(3) The exemption provided by this article has effect for the period during which the impediment exists.

(4) The party who fails to perform must give notice to the other party of the impediment and its effect on his ability to perform. If the notice is not received by the other party within a reasonable time after the party who fails to perform knew or ought to have known of the impediment, he is liable for damages resulting from such non-receipt.

(5) Nothing in this article prevents either party from exercising any right other than to claim damages under this Convention.

Under the Contract, Cotecna had the responsibility for

inspecting the Aqaba Goods and issuing the credit conform

documents. The facts set forth above establish that but for the

41

war, the Cotecna inspectors would not have been withdrawn and the U.N. Oil for Food commodities program would have continued without any need for reprioritization. Hilaturas sent a letter to the U.N. Office of the Iraq Programme on March 24, 2003, asserting that delivery of the yarn could not be completed "as a consequence of the withdrawal of the COTECNA staff from the entry point of Trebil and the outbreak of war." See Santacreu Aff., Ex. F at 1. The letter advised that "the so painfull and regretfull [sic] circumstances adviced [sic] us to postpone shipment to the utmost - but within the L/C validity (Apr. 30th) - with the hope that in the meantime some solution may be glimpsed." Id. It is thus undisputed that "with Cotecna's withdrawal from the region, Hilaturas was unable to secure credit-conform documents, which was a condition precedent to the payment of the letter of credit issued on behalf of Hilaturas under the OFP Contract." Pl. Mem. 28, citing Santacreu Aff. ¶ 25.

Hilaturas argues, however, that "Iraq had an obligation to offer alternatives to Hilaturas once it became clear that Hilaturas could not secure credit-conform documents from Cotecna." Pl. Mem. 27. Hilaturas is not clear as to the source of this alleged duty. Hilaturas does cite CISG art. 54, which states that "[t]he buyer's obligation to pay the price

42

includes taking such steps and complying with such formalities as may be required under the contract or any laws and regulations to enable payment to be made." However, the duty described in article 54 does not speak to whether a buyer is required to accept alternative performance when it becomes clear that seller cannot perform according to the contract's terms, but rather addresses the buyer's performance.

Article 7(2) instructs that questions concerning matters as to which the CISG is silent "are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law." CISG, art. 7(2). See also Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1027-28 (2d Cir. 1995) ("Because there is virtually no caselaw under the Convention, [the courts] look to its language and to the 'general principles' upon which it is based."). The CISG does not address the question of substitute performance. Article 46 of the CISG does, however, discuss substitute goods, and thus, pursuant to art. 7(2), informs the appropriate rule for substitute performance under the CISG:

> If the goods do not conform with the contract, the buyer may require delivery of substitute goods only if the lack of conformity constitutes a fundamental breach of contract and a request for substitute goods is made either in

43

conjunction with notice given under article 39 or
within a reasonable time thereafter.

CISG, art. 46(2). A breach of contract is "fundamental" under
the CISG "if it results in such detriment to the other party as
substantially to deprive him of what he is entitled to expect
under the contract, unless the party in breach did not foresee
and a reasonable person of the same kind in the same
circumstances would not have foreseen such a result." CISG,
art. 25.

Courts also often look to analogous provisions of the
U.C.C. to inform decisions under the CISG. See, e.g., Delchi
Carrier, 71 F.3d at 1028 ("Caselaw interpreting analogous
provisions of Article 2 of the Uniform Commercial Code . . . may
also inform a court where the language of the relevant CISG
provisions tracks that of the UCC. However, UCC caselaw is not
per se applicable." (quotation omitted)); Macromex SRL v. Globex
International, Inc., 08 Civ. 114 (SAS), 2008 WL 1752530, at *2
(S.D.N.Y. Apr. 16, 2008); Raw Materials, Inc. v. Manfred
Forberich GmbH & Co., KG, 03 C 1154, 2004 WL 1535839, at *3
(N.D. Ill. July 7, 2004).

In Macromex, another court in this district recently
approved of an arbitrator's use of U.C.C. § 2-614 to resolve a

44

dispute involving the availability of substitute performance under a contract governed by the CISG. 2008 WL 1752530. Under section 2-614, "[i]f without fault of either party . . . the agreed manner of performance . . . becomes commercially impracticable but a commercially reasonable substitute is available, substitute performance must be tendered and accepted." The official comment states that "a reasonable substituted performance tendered by either party should excuse that party from strict compliance with the contract terms which do not go to the essence of the agreement." Id. cmt. 1.

The CISG's concept of "fundamental breach" is consonant with the concept of "contract terms which . . . go to the essence of the agreement," and thus section 2-614 is a useful guide in addressing the question of substitute performance under the CISG.

Turning to the facts of this case, Hilaturas has failed to allege that it ever tendered reasonable substitute performance, nor does Hilaturas describe any method of substitute performance that was available. Furthermore, it is clear that confirmation by Cotecna was an essential term of the agreement. Hilaturas acknowledges that confirmation by the Secretary General's designee that exported goods had arrived in

Iraq and complied with the conditions of the Letter of Credit
was a condition precedent to payment under the Letter of Credit,
and it was likewise an explicit requirement of the Contract.
See Pl. Mem. 28; Santacreu Aff., Ex. B at ¶ 9-3. The Cotecna
inspectors were withdrawn on March 17, 2003. See Santacreu
Aff., Ex. G. The Government of Iraq was subsequently
overthrown. As a consequence of the war, the U.N. Security
Council reorganized the OFFP, giving the OIP the authority to
renegotiate and make prioritization decisions as to OFFP
contracts. The unprioritized Contract stayed with the OIP until
the OFFP was disestablished in November, 2003, well after the
Letter of Credit had expired on April 30, 2003. See Def. Stmt.
¶ 27. The interim Government of Iraq was not established until
June, 2004. Because hostilities prevented inspection and
acceptance of the goods per the terms of the Contract while the
Letter of Credit was in effect, performance under the Contract
was impossible.

Hilaturas posits that "[e]ven in the case of *force
majeure*, Iraq had the obligation to cure any resulting breach at
the earliest opportunity it had to do so." Id. This argument
would turn the doctrine of impossibility on its head, since it
was Hilaturas, and not Iraq, that was unable to perform its
obligations under the Contract due to the advent of war and the

46

withdrawal of the Cotecna inspectors. Iraq, as the buyer, does not bear a legal duty to compensate Hilaturas for goods that were never delivered due to unforeseen events outside the control of the parties.

Because the war precluded the performance of the Contract prior to its expiration by the termination of the Letter of Credit, summary judgment dismissing the contract claim is appropriate.

## IV. CONCLUSION

As set forth above, the motion of the Republic of Iraq to dismiss the complaint for failure to effect service in accordance with FISA is granted, leave to re-serve is denied, and alternatively the motion of the Republic of Iraq for summary judgment dismissing the complaint is granted and the cross-motion of Hilaturas is denied.

Submit judgment on notice.

It is so ordered.

**New York, N.Y.**
**August  2 0 , 2008**

**ROBERT W. SWEET**
**U.S.D.J.**